ANDREW H. BAKER, SBN 104197
BEESON, TAYER & BODINE, APC
483 Ninth Street, 2nd Floor
Oakland, CA  94607
Telephone:   (510) 625-9700
Facsimile:   (510) 625-8275
Email:       abaker@beesontayer.com

Attorneys for Defendant
Teamsters Local 2010

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARA O'CALLAGHAN and JENEE MISRAJE, | Case No. 19-CV-02289 JVS(DFM) |
| Plaintiffs, | TEAMSTERS LOCAL 2010'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA; TEAMSTERS LOCAL 2010; and XAVIER BECERRA, in his official capacity as Attorney General of California, | Hearing Date:    June 10, 2019 <br> Hearing Time:    1:30 p.m. <br> Courtroom:       10A <br> Judge:           Hon. James V. Selna <br> Complaint Filed: March 27, 2019 <br> Trial Date:      None set |
| Defendants. | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF THE ISSUE ............................................................1

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................2

ARGUMENT......................................................................................4

I.    Plaintiffs' Demand To Be Released From Union Membership Is Moot ...........5

II.   Plaintiffs' Have Not Established Grounds for an Injunction Halting
      Enforcement of their Voluntary Payroll-Deduction Authorizations.................6

      A.    Plaintiffs Have No Likelihood of Success on the Merits of this Claim....6

            1.   Plaintiffs are bound by the terms of the dues-deduction
                 authorization agreements they voluntarily executed .....................6

            2.   The Supreme Court's decision in *Janus* does not allow
                 Plaintiffs to renege on their voluntary payroll-deduction
                 authorization agreement ................................................................9

      B.    Plaintiffs Will Not Suffer any Irreparable Harm in the Absence of a
            Preliminary Injunction ........................................................................12

      C.    Neither the Balance of Hardships nor the Public Interest Favors
            Granting Preliminary Injunctive Relief ................................................14

III.  Plaintiffs Cannot Establish a Likelihood of Success on the Merits of their
      Attack on Exclusive Representation ...................................................................15

      A.    California's Higher Education Employment Relations Act .............15

      B.    *Knight* Establishes the Constitutionality of Exclusive Representation-
            Based Collective Bargaining in Public Employment .........................17

      C.    *Janus* Did Not Disturb Settled Precedent that Public Employers
            May Use Exclusive Representative Collective Bargaining ...............22

      D.    HEERA Does Not Compel Plaintiff To Speak or To Associate
            with Local 2010 Within the Meaning of the First Amendment.........23

CONCLUSION ......................................................................................25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Abood v. Detroit Bd. Of Educ.,*
431 U.S. 209 (1977) .............................................................................................16

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ............................................................................. 5

*Babb v. California Teachers Ass'n,*
2019 WL 2022222 (C.D. Cal. May 8, 2019) .................................................21, 22

*Belgau v. Inslee,* No. 18-5620,
2018 WL 4931602 (W.D. Wash. Oct. 11, 2018) ...........................................11, 13

*Bierman v. Dayton,*
900 F.3d 570 (8th Cir. 2018) ...........................................................................20, 22

*City of Madison, Joint Sch. Dist. No. 8 v. Wisc. Emp't Relations Comm'n,*
429 U.S. 167 (1976) .............................................................................................16

*Cohen v. Cowles Media Co.,*
501 U.S. 663 (1991) .............................................................................10, 11, 12

*D'Agostino v. Baker,*
812 F.3d 240 (1st Cir. 2016) ..........................................................................21, 25

*Dodocase VR, Inc. v. MerchSource, LLC,* No. 17-cv-07088,
2018 WL 1475289 (N.D. Cal. Mar. 26, 2018) ....................................................14

*Feldman v. Ariz. Sec'y of State's Office,*
843 F.3d 366 (9th Cir. 2016) ..........................................................................5, 14

*Fisk v. Inslee,* No. C16-5889,
2017 WL 4619223 (W.D. Wash. Oct. 16, 2017) ...................................7, 8, 9, 12

*Graphic Communications Dist. Council 2 (Data Documents),*
278 NLRB 365 (1986) ......................................................................................... 6

*Grunwald v. San Bernardino City Unified Sch. Dist.,*
994 F.2d 1370 (9th Cir. 1993) .............................................................................13

*Hicks v. Miranda,*
422 U.S. 332 (1975) .............................................................................................18

*Hill v. Serv. Employees Int'l Union,*
850 F.3d 861 (7th Cir. 2017) ...............................................................................20

*Janus v. AFSCME, Council* 31,
138 S. Ct. 2448 (2018) ..................................................................................passim

*Jarvis v. Cuomo,*
660 F. App'x 72 (2d Cir. 2016) ....................................................................21, 24, 25

*Kidwell v. Transportation Commc'n Union,*
946 F.2d 283 (4th Cir. 1991) .................................................................10

*Knight v. Minnesota Cmty. Coll. Faculty Ass'n,*
460 U.S. 1048 (1983).................................................................18

*Knox v. SEIU Local 1000,*
567 U.S. 298 (2012) .................................................................22

*Lathrop v. Donohue,*
367 U.S. 820 (1961).................................................................24

*Lehnert v. Ferris Faculty Ass'n,*
500 U.S. 507 (1991).................................................................16

*Machinists District 10 v. Allen,*
904 F.3d 490 (7th Cir. 2018) .................................................................6, 8

*Mentele v. Inslee,*
916 F.3d 783 (9th Cir. 2019) .................................................................20, 21, 22

*Minnesota State Bd. for Cmty. Colleges v. Knight,*
465 U.S. 27 (1984) .................................................................*passim*

*N.L.R.B. v. Atlanta Printing Specialties & Paper Prod Union 527, AFL-CIO,*
523 F.2d 783 (5th Cir. 1975) .................................................................6

*N.L.R.B. v. U.S. Postal Serv.,*
827 F.2d 548 (9th Cir. 1987) .................................................................7

*N.L.R.B. v. U.S. Postal Serv.,*
833 F.2d 1195 (6th Cir. 1987).................................................................7

*NLRB v. Granite State Joint Bd. Textile Workers Union,*
409 U.S. 213 (1972) .................................................................8

*Reisman v. Associated Faculties,*
2018 WL 6312996 (D. Me. Dec. 3, 2018).................................................................21, 24

*Rumsfeld v. FAIR,*
547 U.S. 47 (2006) .................................................................23

*Smith v. Arkansas State Highway Employees,*
441 U.S. 463 (1979) .................................................................19

*Smith v. Superior Court, Cty. of Contra Costa,*
2018 WL 6072806 (N.D. Cal. Nov. 16, 2018) .................................................................12, 13

*Steele v. Drummond,* 275 U.S. 199, 205 (1927) .................................................................14

*Steelworkers Local 4671 (National Oil Well, Inc.),*
302 NLRB 367 (1991) .................................................................7

*Thompson v. Marietta Educ. Ass'n,*
2019 WL 1650113 (S.D. Ohio Jan. 14, 2019).................................................................21

*Uradnik v. Inter Faculty Organization,*
  2018 WL 4654751 (D. Minn. Sept. 27, 2018),...........................................21

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008) ....................................................................................23

*West Virginia Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ....................................................................................23

*Winter v. NRDC,*
  555 U.S. 7 (2008) ..................................................................................4, 14

**Statutes**

29 U.S.C. §159 ...............................................................................................17
Cal. Gov. Code §3560 *et seq.*....................................................................*passim*
Cal. Gov. Code §3567 .....................................................................................16
Cal. Gov. Code §3570 .....................................................................................16
Cal. Gov. Code §3571(a) .................................................................................16
Cal. Gov. Code §3571(c) .................................................................................16
Cal. Gov. Code §3571.1(a) ..............................................................................16
Cal. Gov. Code §3573 .....................................................................................16
Cal. Gov. Code §3576 .....................................................................................16
Cal. Gov. Code §3578 ...............................................................................15, 16

**STATEMENT OF THE ISSUE**

Have Plaintiffs satisfied all four factors for the extraordinary remedy of a preliminary injunction?

**INTRODUCTION**

Plaintiffs Cara O'Callaghan ("O'Callaghan") and Jenee Misraje ("Misraje") (collectively, "Plaintiffs") filed a Complaint on March 27, 2019, seeking, *inter alia*, an order barring Teamsters Local 2010 ("Local 2010" or "the Union") from continuing to collect fees from them after their resignation from the Union, and barring the Union from continuing to act as their exclusive collective bargaining representative.  This matter is now before the Court on Plaintiff's Motion for a Preliminary Injunction with regard to both claims, as well as an additional claim not contained in the Complaint – Plaintiffs also seek to enjoin the Union to end Plaintiffs' membership in Local 2010.

With regard to the claim seeking to compel Local 2010 to permit Plaintiffs to resign their membership from the Union, Plaintiffs simply ignore the facts as admitted in both their Complaint and in the Motion for Preliminary Injunction:  Local 2010 processed their resignations from membership last year upon Plaintiffs' submission of their request to resign.

With regard to the claim protesting the Union's continuing collection of fees from Plaintiffs, Plaintiffs voluntarily became members of Local 2010.  When Plaintiffs contracted to become members of Local 2010, they voluntarily authorized their membership dues to be paid to the Union through payroll deduction.  They also voluntarily agreed that this payroll-deduction authorization could be revoked only at certain times in a given year, irrespective of whether they resigned their Union membership.  Pursuant to that agreement, when Plaintiffs resigned from the Union in 2018, their payroll-deduction authorization could not be revoked until a later date; July 27, 2019, in the case of Misraje, and March 31, 2022, in the case of O'Callaghan.

Once that is understood, it becomes clear that Plaintiffs' Complaint, and, by extension, their motion for a preliminary injunction to stop the deduction of fees from

their paychecks is based entirely on a false premise.  The false premise on which Plaintiffs found this claim is that, once they resigned as members of Local 2010, fees were being deducted from their paychecks without their consent.  But Plaintiffs *did* consent to the deduction of fees through July 27, 2019, in the case of Misraje, and March 31, 2022, in the case of O'Callaghan, when, as part of the membership contracts that they entered into with Local 2010, they authorized the deduction of fees through payroll deduction and agreed not to revoke that authorization except at certain times of the year.  The First Amendment does not allow Plaintiffs to renege on a contractual obligation, and nothing in the Supreme Court's decision in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), on which Plaintiff heavily relies, is to the contrary.

Finally, with regard to Plaintiffs' attack on the concept of exclusive representation, Plaintiffs' theory that exclusive representation collective bargaining, by itself, violates the First Amendment rights of bargaining unit workers is foreclosed by the Supreme Court's decision in *Minnesota State Bd. for Cmty. Colleges v. Knight,* 465 U.S. 27 (1984).

Plaintiffs therefore cannot establish that they are likely to succeed on the merits of their claims.  For this reason, as well as the fact that Plaintiffs have not established any of the other factors necessary to obtain preliminary injunctive relief with regard to their claim that their authorized fee deductions should be halted, Plaintiffs' motion should be denied.

<u>STATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

Local 2010 is a local union with approximately 13,691 employees located throughout California.  (Exh. 1, Rabinowitz Decl., ¶ 2.)  Among the employees represented by Local 2010 are certain employees of the University of California ("the University"), including Plaintiffs.  (*Id.*)

O'Callaghan voluntarily became a member of Local 2010 on May 31, 2018.  (*Id.* ¶ 8.)  At that time, O'Callaghan signed a membership contract, which contained a payroll-deduction authorization agreement through which she agreed "voluntarily" to

pay her Union membership dues through payroll deduction.  (*Id.*)  That authorization specifically provided that:

> [t]his authorization shall remain in effect for the duration of the existing collective bargaining agreement, if any, and yearly thereafter until a new CBA is ratified, unless I give written notice via U.S. mail to both the employer and Local 2010 during the 30 days prior to the expiration of the CBA or if none the end of the yearly period.

(Exh. 2, Cornejo Decl. Exh. 1.)

Misraje voluntarily became a member of Local 2010 on July 27, 2015.  (Exh. 1, Rabinowitz Decl. ¶ 11.)  At that time, Misraje signed a membership contract, which contained a "voluntary" payroll-deduction authorization agreement through which she agreed to pay her Union membership dues through payroll deduction.  (*Id.*)  That authorization specifically provided that:

> This authorization and assignment shall be irrevocable for the term of the existing collective bargaining agreement between the Union and the employer or for one year, whichever is lesser, and shall automatically renew itself for success yearly … periods thereafter … unless I give written notice to the employer and the union at least sixty (60) days, but not more than seventy-five (75) days before any periodic renewal date of this authorization and assignment of my desire to revoke the same.

(Exh. 2, Cornejo Decl. Exh. 2.)

An advance commitment by a union member to pay dues through payroll deduction for a set period of time serves important interests for the Union.  It provides increased funding predictability, allowing the Union to prepare responsible budgets and make long-term funding commitments.  (Exh. 1, Rabinowitz Decl. ¶ 6.)  In addition, a dues-deduction authorization disincentivizes an employee from signing up to become a Union member solely to obtain a particular benefit and then dropping membership immediately thereafter.  (*Id.*)

O'Callaghan resigned her Union membership effective on June 29, 2018.  (*Id.* ¶ 8.)  Under the dues-deduction authorization agreement that O'Callaghan voluntarily executed as part of her membership contract, her next opportunity to revoke her

payroll-deduction authorization is March 31, 2022, which is the expiration date of the Memorandum of Understanding between Local 2010 and Plaintiff's employer, the University. (*Id.* ¶ 10*;* Exh. 1.)  Misraje resigned her Union membership effective on August 8, 2018. (*Id.* ¶ 11.)  Under the dues-deduction authorization agreement that Misraje voluntarily executed as part of her membership contract, her next opportunity to revoke her payroll-deduction authorization is July 27, 2019, which is the expiration date of the anniversary of the execution of her payroll-deduction authorization. (*Id.* ¶ 12*;* Exh. 2.)

On March 27, 2019, Plaintiffs filed a Complaint in this Court against Local 2010, the University, and the California Attorney General, ECF No. 1, seeking, *inter alia*, to cease the continued payment of fees to the Union following their resignations, and to void the Union's role as exclusive bargaining representative of the University bargaining unit in which Plaintiffs are employed.

In the meantime, the Union has placed all fee payments received from O'Callaghan since June 29, 2018, and all fee payments received from Misraje since August 8, 2018, into an interest-bearing escrow account. (Exh. 3, Naterman Decl ¶¶ 3 & 4.)  The Union has committed to placing all future payments received on Plaintiffs' behalf into that escrow account, and all fees received from Plaintiffs since June 29 2018 (O'Callaghan) and August 8, 2018 (Misraje) will remain in escrow until the conclusion of this litigation. (*Id.*)

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC,* 555 U.S. 7, 22 (2008).  To obtain a preliminary injunction, a plaintiff must make a clear showing of four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.  A plaintiff in the Ninth Circuit may also obtain a preliminary injunction by satisfying an

alternative standard of showing "that serious questions going to the merits were raised and the balance of hardships tips *sharply* in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011) (emphasis added). Under either standard, the plaintiff must make a showing of all four *Winter* factors. *Id.; see also Feldman v. Ariz. Sec'y of State's Office,* 843 F.3d 366, 375 (9th Cir. 2016).

## I.   Plaintiffs' Demand To Be Released From Union Membership Is Moot.

Plaintiffs have no likelihood of success on the merits of their claim that the Union is violating their Constitutional rights by refusing to release them from membership for the simple fact that the Union processed the membership resignations of both Plaintiffs long before this Complaint was filed.

Plaintiffs acknowledge this fact in their Complaint and in their Brief in Support of this Motion for Preliminary Injunction. Thus, O'Callaghan admits in the Complaint and in her Brief that the Union by letter dated July 24, 2018, confirmed that she was free to resign her membership at any time. (Compl., ECF No. 1, ¶ 18; Pl.s' Br., ECF No. 22-1, at 4.) Likewise, Misraje admits in the Complaint and in her Brief that the Union on August 9, 2018, advised her that her membership would be terminated per her request, and on August 27, 2018, confirmed that she was no longer a member of the Union. (Compl., ECF No. 1, ¶ ¶ 28 & 31; Pl.s' Br., ECF No. 22-1, at 5.)

Indeed, the Union's termination of Plaintiffs' membership in 2018, in response to Plaintiffs' requests, is confirmed by the Declaration of Jason Rabinowitz. (Exh. 1, ¶ ¶ 9 & 12.)

Perhaps in recognition of the facts here, Plaintiffs' Complaint does *not* include a cause of action seeking to compel Local 2010 to allow Plaintiffs to resign their membership. For this reason, as well as the admitted fact that the Union has already, even before the Complaint was filed in this matter, released Plaintiffs from membership, Plaintiff's motion for an order enjoining the Union to end their membership must be denied.

**II.    Plaintiffs Have Not Established Grounds for an Injunction Halting Enforcement of their Voluntary Payroll-Deduction Authorizations.**

    A.    <u>Plaintiffs Have No Likelihood of Success on the Merits of this Claim</u>.

Plaintiffs cannot establish that there are serious questions going to the merits of their claim, let alone can they establish a likelihood of success on the merits.  Because Plaintiffs signed a voluntary dues-deduction authorization agreement under which fees are to be deducted from their wages until March 31, 2022 (O'Callaghan) and July 27, 2019 (Misraje), Plaintiffs are contractually obligated to abide by the terms of that agreement.  *See supra* pp. 2-4. Plaintiffs make much of the Supreme Court's decision in *Janus,* but nothing in *Janus* alters the well-established principle that the First Amendment does not grant individuals a right to renege on binding contractual obligations.

    *1.    Plaintiffs are bound by the terms of the payroll-deduction authorization agreements they voluntarily executed.*

A dues-deduction authorization agreement is "a contract ... authorizing the employer to withhold dues from the employee's wages, but reserving to the employee the power of revocation at specified periods." *N.L.R.B. v. Atlanta Printing Specialties & Paper Prod Union 527, AFL-CIO,* 523 F.2d 783, 785 (5th Cir. 1975); *see also Graphic Communications Dist. Council 2 (Data Documents),* 278 NLRB 365, 367 (1986).  These are common arrangements by which an employee who chooses to become a union member elects to pay dues in installments through payroll deduction – often a more advantageous and convenient payment method than paying in a lump sum by cash or check and, in exchange for that benefit, agrees to limit the times at which the authorization can be revoked.  As courts have recognized, "[d]ues-checkoff authorizations are *optional payroll deduction contracts* between employers and individual employees, similar to health insurance premium payroll deductions or retirement savings arrangements." *E.g., Machinists District 10 v. Allen,* 904 F.3d 490, 506 (7th Cir. 2018) (emphasis added).  Dues-deduction authorizations are *not* an "obligation to pay dues as a condition of employment." *Id.* at 495; *see also id.* at 506

("Checkoff authorizations irrevocable for one year after [their effective] date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time.") (alteration in original); *Fisk v. Inslee,* No. C16-5889, 2017 WL 4619223, at *4 (W.D. Wash. Oct. 16, 2017) (signed membership card containing dues authorization agreement was "a valid contract").

Such dues-deduction authorization agreements create binding financial obligations that survive an employee's resignation from the union.  *See, e.g., Steelworkers Local 4671 (National Oil Well, Inc.),* 302 NLRB 367, 368 (1991) (dues were still owed under checkoff authorization after employee's resignation of membership because, under the express terms of the checkoff authorization the employee signed, he "clearly authorized the continuation of his dues deduction even in the absence of union membership"); *N.L.R.B. v. U.S. Postal Serv.,* 833 F.2d 1195, 1196 (6th Cir. 1987) (dues authorization not revocable despite resignation from membership).

In the very context at issue here – a dues deduction authorization agreement with an irrevocability period signed by a union member who resigned from union membership before that period expired – the Ninth Circuit explained that such a "dues-checkoff authorization is a contract," and "[a] party's duty to perform even a wholly executory contract is not excused merely because he decides that he no longer wants the consideration for which he has bargained. …[T]he clear 'legal import' of the authorization's language ... b[i]nd[s] the employee to abstain from revoking the authorization," even after he resigns union membership.  *N.L.R.B.* v. *U.S. Postal Serv.,* 827 F.2d 548, 554 (9th Cir. 1987); *see also Fisk,* 2017 WL 4619223, at *5 ("[A] worker can refuse to associate with or join a union. That is her prerogative. But, once she joins voluntarily, in writing, she has the obligation to perform the terms of her agreement."). These cases reflect the general principle that an individual has the right to resign from a voluntary association "as he sees fit subject of course to any financial obligations due

and owing the group with which he was associated." *NLRB v. Granite State Joint Bd. Textile Workers Union,* 409 U.S. 213, 216 (1972) (internal quotation marks omitted).

In accordance with these precedents, Plaintiffs' membership agreements expressly state that the payroll-deduction authorizations, which are "voluntary," are either "not conditioned on my present or future membership" (Misraje) or in effect "regardless my membership status" (O'Callaghan), unless the agreement is revoked during a specified window period.  (Exh. 2, Cornejo Decl. Exhs. 1 and 2.)  Plaintiffs are therefore bound by these agreements, under which their payroll deduction authorizations remain in effect, in the case of O'Callaghan, until March 31, 2022, the date on which the collective bargaining agreement between the Union and the University expires, or, in the case of Misraje, until July 27, 2019, the anniversary of Misraje's payroll-deduction authorization.

There is good reason to hold union members such as Plaintiffs to their dues-deduction authorization agreements that are irrevocable for a set period of time.  Such agreements are easier for the union (and the employer) to administer, as they prevent members from routinely authorizing and de-authorizing deductions at will.  (*See* Exh. 1, Rabinowitz Decl. ¶ 6)  *See also Machinists Dist. 10,* 904 F.3d at 492 ("Many of these authorizations are irrevocable for a specified period – often one year – for reasons of administrative simplicity").  In addition, requiring members to commit to a dues-deduction authorization for a set period of time allows the union to more effectively plan and make advance financial commitments, such as renting offices, hiring staff, and entering into contracts with other vendors.  (*See* Exh. 1, Rabinowitz Decl. ¶ 6)  *See also Fisk,* 2017 WL 4619223, at *3 (period of irrevocability "provides [the union] with financial stability by ensuring a predictable revenue stream" and allows the union to "forecast how much revenue it will receive over a given year and budget accordingly" and to "make long-term financial commitments without the possibility of a sudden loss of revenue").  Such commitments also reflect that union members have voting rights – in connection with officer elections, contract-ratification

referenda and other matters – that empower them to influence union events for multiple years.  (*See* Exh. 1, Rabinowitz Decl. ¶ 6)  *See also Fisk,* 2017 WL 4619223, at \*3 (explaining that "the irrevocability of a Union member's dues authorization for a set period … prevents [members] who sign cards from gaming the Union's system of governance").  Such commitments also deter employees from signing up solely to obtain a benefit or discount through one of the union's member-only benefits programs and then immediately cancelling their dues deductions.

In sum, payroll-deduction authorization agreements such as the one that Plaintiffs executed are binding agreements that survive resignation of union membership and serve many important purposes.  Plaintiffs' payroll-deduction authorizations – pursuant to which they committed to have fees deducted from their wages until March 31, 2022 (O'Callaghan) or July 27, 2019 (Misraje) – should therefore be enforced.

> 2. *The Supreme Court's decision in Janus does not allow Plaintiffs to renege on their voluntary payroll-deduction authorization agreements.*

Plaintiffs argue that because they resigned from the Union, they have a constitutional right to immediately stop paying dues or fees under *Janus*.  (*See* Pls.' Br., ECF No. 22-1, at 9-11.)  That argument is wrong.

As a threshold matter, Plaintiffs' reliance on *Janus* is misplaced because the relationship between unions and their voluntary members was not at issue in *Janus*. The question in *Janus* was whether it was consistent with the First Amendment for a state to compel *nonmembers* of a union – *i.e.*, individuals who have *not* affirmatively chosen to join a union and have *not* affirmatively chosen to enter into a contract to secure voting rights or member benefits in exchange for paying dues – to compensate the union for costs of contract administration and grievance handling as a condition of government employment.  138 S. Ct. at 2460.  The passage from *Janus* on which Plaintiff relies makes the Court's focus on nonmembers patently clear:

1

> Neither an agency fee nor any other payment to the union may be deducted from a *nonmember's* wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, *nonmembers* are waiving their First Amendment rights, and such a waiver cannot be presumed.

2

3

4   138 S. Ct. at 2486 (emphases added).  In other words, *Janus* held that the First

5   Amendment precludes a state from compelling nonmembers to pay so-called "agency

6   fees" to a union.  By contrast, Plaintiffs' continued payment of Union dues results not

7   from state compulsion but from their voluntary decision to affirmatively enter into a

8   private contractual agreement with the Union, for which they received valuable

9   consideration in return.  (*See supra* pp. 2-3, 8-9.)  Plaintiffs' voluntary and affirmative

10  decision to choose Union membership and authorize the payment of their Union dues

11  through payroll deduction is thus completely different from the involuntary agency-fee

12  payments at issue in *Janus.  See Kidwell v. Transportation Commc'n Union,* 946 F.2d

13  283, 292-93 (4th Cir. 1991) ("Where the employee has a choice of union membership

14  and the employee chooses to join, the union membership money is not coerced.  The

15  employee is a union member voluntarily.").  The fact that Plaintiffs ceased to be Union

16  members as of their resignation is irrelevant, given that their dues-deduction

17  authorizations were voluntary and expressly states that they survives their resignation

18  of membership.

19          And, even if *Janus* were deemed to apply to Plaintiffs' voluntary dues-deduction

20  authorization, there could be no constitutional defect in the agreement that Plaintiffs

21  signed.  It is well-established that "the First Amendment does not confer ... a

22  constitutional right to disregard promises that would otherwise be enforced under state

23  law." *Cohen v. Cowles Media Co.,* 501 U.S. 663, 672 (1991).  In *Cohen,* the Supreme

24  Court rejected the claim that the First Amendment prohibited enforcement of a

25  newspaper's promise not to reveal the identity of a confidential source.  The

26  newspaper had breached its promise and the source sued in state court under the quasi-

27  contractual doctrine of promissory estoppel.  *Id.* at 666.  The Minnesota Supreme

28  Court held that the state's enforcement of the confidentiality promise would violate the

newspaper's First Amendment rights, *id.* at 667, but the U.S. Supreme Court reversed. The Court recognized that the doctrine of promissory estoppel simply "requires those who make certain kinds of promises to keep them." *Id* at 672. The application of promissory estoppel therefore did not "offend the First Amendment." *Id.* at 669.

The same is true with respect to the parties' compliance with the terms of Plaintiffs' payroll-deduction authorization agreement. The continuation of payroll deductions pursuant to an agreement that Plaintiffs freely entered into enforces the Union's rights under generally applicable contract law in the same manner as the Court's enforcement of the newspaper's promise in *Cohen*. *See* 501 U.S. at 668. As *Cohen* holds, the First Amendment is not a license for a party to an otherwise valid contract to renege on his promises.

*Cohen* directly controls this case and prevents Plaintiffs from demonstrating any chance of success on the merits of their claim. Indeed, just recently, the Western District of Washington rejected an indistinguishable request for a preliminary injunction in *Belgau v. Inslee,* No. 18-5620, 2018 WL 4931602 (W.D. Wash. Oct. 11, 2018). There, the plaintiffs – who signed materially identical dues-deduction authorizations to the payroll-deduction authorization that Plaintiffs signed here[1] – moved to enjoin the State of Washington from continuing to collect their membership dues following their resignations from the union. *Id.* at *4. The *Belgau* Court held that the plaintiffs had not established even serious questions going to the merits, specifically rejecting the argument that continued deduction of union dues violated the plaintiffs' First Amendment rights under *Janus:*

> Here, unlike in *Janus*, the Plaintiffs entered into a contract with the Union to be Union members and agreed in that contract to pay Union dues for one year.
> "[T]he First Amendment does not confer . . . a constitutional right to disregard promises that would otherwise be enforced

---

[1] The authorizations signed by the plaintiffs in *Belgau,* similarly to the authorizations signed by Plaintiffs here, expressly stated that they were "voluntary and not a condition of my employment" and that they would remain in effect "regardless of whether I am or remain a member of the Union." *Belgau,* 2018 WL 4931602, at *2.

under state law." *Cohen v. Cowles Media Co.,* 501 U.S. 663, 672 (1991). A person has the right to contract away their First Amendment protections. *See Fisk v. Inslee,* 2017 WL 4619223 (W.D. Wash. Oct. 16, 2017). Plaintiffs' assertions that they didn't knowingly give up their First Amendment rights before *Janus* rings hollow. Janus says nothing about people who join a Union, agree to pay dues, and then later change their mind about paying union dues. *(Id.* at *5).

*Accord, Smith v. Superior Court, Cty. of Contra Costa*, 2018 WL 6072806 (N.D. Cal. Nov. 16, 2018).

In sum, *Janus* did not change the law governing the formation and enforcement of voluntary contracts between unions and their members, or *Cohen's* holding that voluntary contracts are fully enforceable even when the First Amendment would have precluded the government from compelling a party to engage in the same activity. Plaintiffs therefore cannot show that there is a likelihood of success on the merits of their claim, or even that there are serious questions that go to the merits of their claim.

B.   Plaintiffs Will Not Suffer any Irreparable Harm in the Absence of a Preliminary Injunction**.**

Plaintiffs' claim of irreparable injury rests entirely on the premise that fee deductions following resignation of membership will violate their First Amendment rights.  (*See* Pl.s' Br. 6 - 9.)  But, as we have shown, the deduction of Union fees pursuant to the voluntary payroll-deduction authorizations that Plaintiffs executed does *not* violate Plaintiffs' First Amendment rights.  Plaintiffs' claim of irreparable harm thus fails for the same reason that Plaintiffs have not shown a likelihood of success on the merits of his claim.

Even if the deduction of Plaintiffs' fees pursuant to their own voluntary payroll-deduction authorizations somehow implicated the First Amendment, Plaintiffs have not made a showing of likely irreparable harm.  Quite simply, Plaintiffs are unable to explain why, if they were able to prevail on the merits, they would not be able to recover money taken from their paychecks since the date of their initial resignations from Local 2010.

Moreover, the Union's escrow of all fees that have been deducted, or will be deducted through the date when Plaintiffs' payroll-deduction authorizations will terminate, from Plaintiffs' paychecks since their resignation from Union membership eliminates any conceivable First Amendment harm that could be irreparable.  The First Amendment interest that the Supreme Court recognized in *Janus* was the right not to be compelled by the government to subsidize the speech of another private speaker (*i.e.,* the union).  *Janus,* 138 S. Ct. at 2463-65.  Because Local 2010 has escrowed, and will continue to escrow, all fees deducted from Plaintiffs' wages until the litigation in this matter is concluded (Exh. 3, Naterman Decl. ¶¶ 3 & 4), there is no immediate risk that *any* of Plaintiffs' money will be used to subsidize the Union's speech.  There is thus no possibility, let alone likelihood, of irreparable harm to Plaintiffs' First Amendment rights that could support the issuance of a preliminary injunction.  Indeed, the Ninth Circuit has squarely held that escrow of all disputed payments to a union eliminates any First Amendment harm to the employees making those payments. *Grunwald v. San Bernardino City Unified Sch. Dist.,* 994 F.2d 1370, 1373-74 (9th Cir. 1993) (rejecting plaintiffs' argument "that even the temporary retention of funds [by the union in escrow] ... violates their First Amendment right against compelled speech" and holding that the defendant's "escrow scheme poses no risk that plaintiffs' substantive free speech rights will be violated").  *See also Belgau,* 2018 WL 4931602, at *6 (holding, in denying preliminary-injunction motion indistinguishable from that filed here, that plaintiffs "failed to show that they will suffer irreparable harm in the absence of preliminary relief" because "the Union states that it has, and will continue, to escrow all dues in an interest bearing account until this litigation is resolved and will not use the dues for any Union activity"); *accord*, *Smith v. Superior Court, Cty. of Contra Costa*, 2018 WL 6072806.

This Court therefore should conclude that Plaintiffs have not satisfied their burden of showing a likelihood of irreparable harm with respect to this second claim.  And because Plaintiffs must demonstrate all four factors for injunctive relief in order to

obtain a preliminary injunction, *Feldman,* 843 F.3d at 375, Plaintiffs' motion on this claim should be denied on this basis alone.

C.   Neither the Balance of Hardships nor the Public Interest Favors Granting Preliminary Injunctive Relief.

As shown above, Plaintiffs have not demonstrated that they will likely succeed on the merits of their claim or that they will suffer any irreparable harm.  The Court therefore need not reach the remaining *Winter* factors.  In all events, Plaintiffs cannot show either that the balance of hardships tips in their favor, or that the public interest favors injunctive relief.

Because the Union will escrow Plaintiffs' fees until the conclusion of this litigation, Plaintiffs will suffer no irreparable harm at all; the balance of hardships therefore cannot tip in their favor.  By contrast, issuing a preliminary injunction would impose hardships on the Union if the Union ultimately prevails in this litigation, as any attempt by the Union to collect the fees that Plaintiffs voluntarily contracted to pay would require the Union to bring a small-dollar collections lawsuit, the costs of which would far outweigh the amount at issue.

Moreover, a preliminary injunction would undermine the interests of the Union, the University of California, and the public in favor of enforcing private contracts.  *See Steele v. Drummond,* 275 U.S. 199, 205 (1927) ("It is a matter of great public concern that freedom of contract be not lightly interfered with."); *cf. Dodocase VR, Inc. v. MerchSource, LLC,* No. 17-cv-07088, 2018 WL 1475289, at *12 (N.D. Cal. Mar. 26, 2018) (appeal pending) (granting preliminary injunction where doing so would serve the public interest by "protect[ing] the right of parties to freely contract").  As we have shown, the public interest – including the interests of the other Union members, who are nonparties to this action – is served by holding members to their payroll-deduction authorization agreements.

### III. Plaintiffs Cannot Establish a Likelihood of Success on the Merits of their Attack on Exclusive Representation.

California's Higher Education Employment Relations Act ("HEERA") provides for a democratic system of exclusive representative collective bargaining in which the majority of employees in a bargaining unit may, if they choose, select a union representative to negotiate and administer a single collective bargaining agreement to cover the entire unit. *See* Cal. Gov. Code §3560 *et seq.* In such systems, the exclusive representative, when acting in that capacity, owes a duty of fair representation to the entire bargaining unit, including to employees who have chosen not to join the union. *See, e.g.,* Cal. Gov. Code §3578 (recognized employee organization has obligation to represent all employees in bargaining unit). The same democratic system of collective bargaining has been used in the United States for decades for public and private sector employees, including federal employees. *See Janus v. AFSCME Council* 31, 138 S.Ct. 2448, 2466 (2018).

Plaintiffs' allege that the University of California's recognition of Local 2010 as their bargaining unit's HEERA exclusive representative violates their First Amendment rights, and here seek an injunction enjoining the Union's continued representation of that unit. That legal claim is foreclosed by *Minnesota State Board for Community Colleges v. Knight,* 465 U.S. 271 (1984). The Supreme Court held in *Knight* that an indistinguishable system of exclusive representation "in no way restrained [non-union members'] freedom to speak ... or their freedom to associate or not to associate with whom they please, including the exclusive representative." *Id.* at 288; *see also id.* at 291 (plaintiffs in *Knight* were "[u]nable to demonstrate an infringement of any First Amendment right"). Accordingly, Plaintiffs' motion for injunctive relief on this claim should be denied.

### A. California's Higher Education Employment Relations Act

HEERA permits University of California and California State University employees, if they so choose, to designate an "exclusive representative" by submitting proof of majority support or by voting in a secret ballot election, and HEERA also

provides a process for employees to decertify a representative that no longer enjoys majority support.  Cal. Gov. Code §§3573, 3576.  If the employees choose a representative, the public employer must "engage in meeting and conferring with the employee organization selected as exclusive representative … on all matters within the scope of representation."  *Id*. §§3570, 3571(c).

HEERA does not require, and has never required, unit employees to become members of the organization that serves as the unit's exclusive representative, or prohibit them from joining other labor organizations.  To the contrary, HEERA makes it unlawful for employers or exclusive representatives to interfere with the rights of employees to form, join, and participate in the activities of employee organizations of their own choosing.  *Id*. §§3571(a), 3571.1(a).  The designation of an HEERA exclusive representative also does not preclude unit employees from speaking and petitioning about issues regarding the public universities and colleges, just like all other citizens, whether individually or through organizations of their own choosing.[2]

HEERA prohibits the exclusive representative, when acting in that capacity, from discriminating against employees who choose not to become union members by requiring such representatives to "represent all employees in the unit, fairly and impartially."  *Id.* §3578.  HEERA further provides that individual public employees may at any time "present grievances to [their] employer, and have those grievances adjusted, without the intervention of the exclusive representative[.]"  *Id.* §3567.

After the Supreme Court's decision in *Janus,* public employees represented by labor unions who choose not to be members of those unions are no longer required to provide any financial support to cover the costs of union representation.  138 S.Ct. at

---

[2] *See City of Madison, Joint Sch. Dist. No. 8 v. Wisc. Emp't Relations Comm'n,* 429 U.S. 167, 173-76 & n.10 (1976) (bargaining unit members have the same First Amendment rights as other citizens to speak in opposition to union); *Abood v. Detroit Bd. Of Educ.,* 431 U.S. 209, 230 (1977) ("The principle of exclusivity cannot constitutionally be used to muzzle a public employee who, like any other citizen, might wish to express [her] view about governmental decisions concerning labor relations."); *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 521 (1991)

2486.[3]  Although non-members no longer can be required to pay "fair share fees" to the exclusive representative, the exclusive representative still represents the non-member minority and must represent non-members fairly.

The democratic, exclusive representation model of collective bargaining established by HEERA is the same model used for collective bargaining for public employees of the federal government and about 40 other States, the District of Columbia, and Puerto Rico, *see, e.g., Janus,* 138 S.Ct. at 2466; and for private-sector employees covered by the federal National Labor Relations Act and the Railway Labor Act, *see, e.g.,* 29 U.S.C. §159(a).  Exclusive representation is the very essence of labor relations and the collective bargaining framework in this country, and it has been so since passage of the Wagner Act in 1935.

B.    *Knight* Establishes the Constitutionality of Exclusive Representation-Based Collective Bargaining in Public Employment

Plaintiffs allege in Count V of their Complaint that Local 2010's designation as the exclusive representative of their bargaining unit "compels Plaintiffs to associate with the Union and, through its representation of them, it compels them to petition the government with a certain viewpoint, despite that viewpoint being in opposition to Plaintiffs' own goals and priorities for the State of California."  (Compl. ¶74 (ECF 1).)  According to Plaintiffs, this "compel[led]" "association" with the Union "substantially demeans their First Amendment rights."  (Pl.s' Br, p. 13 (ECF No. 26-1).)

But HEERA does not impose any personal obligation on Plaintiffs.  They need not join Local 2010 or endorse its positions and, after *Janus,* they need not even provide any financial support to Local 2010.  Nor are they precluded from speaking and petitioning about any issues, whether individually or through organizations of their

---

[3] S*ee* "California Attorney General Xavier Becerra Advisory: Affirming Labor Rights and Obligations in Public Workplaces," https://oag.ca.gov/system/files/attachments/press_releases/AG%20Becerra%20Labor%20Rights%20Advisory%20FINAL.pdf (California Attorney General's advisory that "a California public-sector employer may no longer automatically deduct a mandatory agency fee from the salary or wages of a non-member public employee who does not affirmatively choose to financially support the union").

own choosing. Plaintiffs' theory that exclusive representation collective bargaining, by itself, violates the First Amendment rights of bargaining unit workers is foreclosed by the Supreme Court's decision in *Minnesota State Bd. for Cmty. Colleges v. Knight,* 465 U.S. 27 (1984) ("*Knight*"), as every court to consider the issue has recognized.

In *Knight,* a group of Minnesota college instructors argued – like Plaintiffs here – that the exclusive representation provisions of that state's public employee labor relations act violated the First Amendment speech and associational rights of employees who did not wish to associate with the union that a majority had chosen as their bargaining unit's exclusive representative. 465 U.S. at 273, 278-79. The state law granted their bargaining unit's elected representative the exclusive right to "meet and negotiate" over employment terms. *Id* at 274. The state law also granted the unit's representative the exclusive right to "meet and confer" with campus administrators about employment-related policy matters outside the scope of mandatory negotiations. *Id.* at 274-75. Only the designated representative had the right to participate in the "meet and negotiate" and "meet and confer" processes, and the designated representative's views were treated as the faculty's "official collective position." *Id.* at 273, 276.

The district court rejected the *Knight* plaintiffs' constitutional challenge with respect to the meet-and-negotiate process. *See id.* at 278. On appeal, the Supreme Court summarily affirmed the lower court's rejection of the *Knight* plaintiffs' "attack on the constitutionality of exclusive representation in bargaining over terms and conditions of employment." *Id.* at 278-79; *Knight v. Minnesota Cmty. Coll. Faculty Ass 'n,* 460 U.S. 1048 (1983).[4] The district court also concluded that the meet-and-confer process violated the rights of faculty members who had not joined the union that served as their exclusive representative. In a separate, full opinion, the Supreme Court reversed the district court's judgment with respect to the meet-and-confer

---

[4] The *Knight* summary affirmance remains binding precedent. *Hicks v. Miranda,* 422 U.S. 332, 344-45 (1975).

process, holding that even with respect to matters not involving terms and conditions of employment subject to bargaining, exclusive representation does not infringe the First Amendment speech or associational rights of non-member employees. *Knight,* 465 U.S. at 278, 288.

The *Knight* Court began its analysis by recognizing that government officials have no obligation to negotiate or confer with faculty members, and that the meet-and-confer process (like the meet-and-negotiate process) was not a "forum" to which plaintiffs had any First Amendment right of access. *Id* at 280-82. The Court explained that non-members also had no constitutional right "as members of the public, as government employees, or as instructors in an institution of higher education" to "force the government to listen to their views." *Id* at 283. The government, therefore, was "free to consult or not to consult whomever it pleases." *Id.* at 285; *see also Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 464-66 (1979) (government did not violate speech or associational rights of union supporters by accepting grievances filed by individual employees while refusing to recognize union's grievances).

The *Knight* Court then went on to consider whether Minnesota's public employee labor relations act violated those First Amendment rights that non-members *could* properly assert – namely, the right to speak and the right to "associate or not to associate." 465 U.S. at 288. The Court concluded that Minnesota's law *"in no way* restrained appellees' freedom to speak on any education-related issue *or their freedom to associate or not to associate* with whom they please, including the exclusive representative." *Id.* (emphasis added).

Non-members' speech rights were not infringed by Minnesota's system of exclusive representation because, while the exclusive representative's status "amplifie[d] its voice in the policymaking process," that amplification did not "impact individual instructors' constitutional freedom to speak." As the Court explained, such amplification is "inherent in government's freedom to choose its advisers" and "[a]

1   person's right to speak is not infringed when government simply ignores that person
2   while listening to others." *Id.*

3       The Supreme Court found no infringement of non-members' associational rights
4   because they were "free to form whatever advocacy groups they like" and were "not
5   required to become members" of the organization acting as the exclusive
6   representative.  465 U.S. at 289.  The Court acknowledged that non-members may
7   "feel some pressure to join the exclusive representative" to serve on its committees and
8   influence its positions. *Id.* at 289-90.  But the Court held that this "is no different from
9   the pressure to join a majority party that persons in the minority always feel." *Id.* at
10  290.  Such pressure "is inherent in our system of government; it does not create an
11  unconstitutional inhibition on associational freedom." *Id.*

12      *Knight* thus squarely considered whether exclusive representation violates the
13  speech or associational rights of individuals who are not members of the union that has
14  been designated as their exclusive representative, and held that it does not do so –
15  thereby foreclosing the contrary claim Plaintiffs assert in Counts V, VI and VII of their
16  Complaint.  *See id.* at 288 ("[T]he First Amendment guarantees the right both to speak
17  and to associate.  *Appellees' speech and associational rights, however, have not been*
18  *infringed ....")* (emphasis added); *id.* at 290 n.12 (non-members' "speech and
19  associational freedom have been wholly unimpaired").

20      The Ninth Circuit recently agreed that *Knight* forecloses the claim that exclusive
21  representative collective bargaining, by itself, violations the First Amendment.  *See*
22  *Mentele v. Inslee,* 916 F.3d 783, 2019 WL 924915, at *4-5 (9th Cir. 2019).  Not only is
23  *Mentele*  binding precedent, but every court to consider the issue has concluded that
24  *Knight* forecloses any claim that a democratic system of exclusive representative
25  collective bargaining violates the First Amendment.  *See Bierman v. Dayton,* 900 F.3d
26  570 (8th Cir. 2018) *cert. denied*, 2019 WL 2078110 (May 13, 2019); *Hill v. Serv.*
27  *Employees Int'l Union,* 850 F.3d 861 (7th Cir. 2017), *cert. denied,* 138 S.Ct. 446
28  (2017); *Jarvis v. Cuomo,* 660 F. App'x 72 (2d Cir. 2016), *cert. denied,* 137 S.Ct. 1204

1  (2017); *D'Agostino v. Baker,* 812 F.3d 240 (1st Cir. 2016), *cert. denied,* 136 S.Ct.

2  2473 (2016); *Reisman v. Associated Faculties,* 2018 WL 6312996 (D. Me. Dec. 3,

3  2018) (appeal filed); *Uradnik v. Inter Faculty Organization,* 2018 WL 4654751 (D.

4  Minn. Sept. 27, 2018), *aff'd,* No. 18-3086 (8th Cir. Dec. 3, 2018) *cert. denied* 2019

5  WL 1886119 (Apr. 29, 2019); *Thompson v. Marietta Educ. Ass'n,* 2019 WL 1650113

6  (S.D. Ohio Jan. 14, 2019); *Babb v. California Teachers Ass'n*, 2019 WL 2022222, at

7  *18 (C.D. Cal. May 8, 2019).

8         Because neither membership nor financial support were required, the Supreme

9  Court held that the plaintiffs in *Knight* retained the "freedom ... not to associate with

10  whom they please, *including the exclusive representative." Id* at 288 (emphasis

11  added).  In *Mentele v. Inslee,* the Ninth Circuit adopted this interpretation of *Knight* as

12  binding Circuit precedent.  *Mentele* considered a claim that Washington's system of

13  exclusive representation in collective bargaining for publicly subsidized child care

14  workers violated the associational rights of individuals who have not joined the union

15  designated as exclusive representative.  *Mentele,* 916 F.3d 783, 2019 WL 924815, at

16  *1.  Affirming the district court's holding that the system did not violate non-

17  members' associational rights, *Mentele* explained that *Knight* "expressly concluded"

18  that the exclusive representation system did not violate non-members' freedom to

19  decline "'to associate with whom they please, including the exclusive representative,'"

20  and "approved the requirement that bound non-union dissenters to exclusive union

21  representation." *Id.* at *5 (quoting *Knight,* 465 U.S. at 288 (emphasis omitted)).

22         Plaintiffs acknowledge *Mentele's* holding, but suggest that this Court can

23  disregard the decision because it involved "partial state employees" rather than "full-

24  fledged public employees like Plaintiffs."  (Pl.s' Br. at p. 13 (ECF No. 26-1).)

25  *Mentele's* analysis of the impact of exclusive representation on non-members'

26  associational rights contains no such limitation, however.  To the contrary, *Mentele*

27  based its holding entirely on *Knight's* analysis of that question, and *Knight* involved

28  exclusive representation for "full-fledged public employees" (specifically, community

college faculty instructors), not "partial" public employees.  465 U.S. at 278.  While *Mentele* went on to consider the "partial" state employment status of the plaintiffs therein in holding that Washington's system would satisfy heightened constitutional scrutiny if such scrutiny applied (which it did not), *see* 916 F.3d 783, 2019 WL 924815, at *6-7; the distinction between partial and full public employment was irrelevant to *Mentele's* holding that exclusive representation does not impinge upon nonmembers' associational rights.  *See Babb v. California Teachers, supra* at *18.

Accordingly, under binding Supreme Court and Ninth Circuit precedent, Plaintiffs' compelled association claim fails as a matter of law.

C.      *Janus* Did Not Disturb Settled Precedent that Public Employers
        May Use Exclusive Representative Collective Bargaining

Plaintiffs rely on the Supreme Court's recent decision in *Janus*.  (*See* Plaintiffs' Pl.s' Br, pp. 9-10 (ECF No. 26-1).)  But *Janus* held only that public employees who are not union members cannot be required *to pay "fair share" or "agency" fees* to an exclusive representative for collective bargaining representation.  *Janus* did not hold that exclusive representation itself violates the First Amendment. 138 S.Ct. at 2460.[5] As the Eighth Circuit recently explained, *Janus* "never mentioned *Knight,* and the constitutionality of exclusive representation standing alone was not at issue." *Bierman,* 900 F.3d at 574.

The majority opinion in *Janus* expressly distinguished between compelled financial support for an exclusive representative and the underlying system of exclusive representation.  *Janus,* 138 S.Ct. at 2465, 2467.  The majority opinion explained that while the States may no longer require public employees to pay fair-share fees to their exclusive representatives, the States can otherwise "keep their labor-relations systems exactly as they are," including by "requir[ing] that a union serve as exclusive bargaining agent for its employees."  *Id.* at 2478, 2485 n.27; *see also id.* at 2466, 2485 n.27 (States may "follow[]the model of the federal government," in which

---

[5] *Knox v. SEIU Local 1000,* 567 U.S. 298 (2012) likewise involved only the collection of money from non-union members.

"a union chosen by majority vote is designated as the exclusive representative of all the employees"); *id.* at 2471 n.7 ("[W]e are not in any way questioning the foundations of modern labor law."). *Janus* observed that exclusive representation might not be permissible in "other contexts," but recognized that in the collective bargaining context, the imposition of a duty of fair representation on the exclusive representative *avoids* any constitutional questions. *Id.* at 2469, 2478.

As such, both *Knight* and *Janus* require rejection of plaintiffs' claim that the exclusive representation model of collective bargaining violates the First Amendment.

D.     **HEERA Does Not Compel Plaintiff To Speak or To Associate with Local 2010 Within the Meaning of the First Amendment**

Even if Plaintiffs' First Amendment claim were not foreclosed by on-point and longstanding precedent, it still would be meritless. Plaintiffs do not allege that they are required to personally do or say anything to join or endorse Local 2010 or its speech.[6] And neither support for Local 2010 nor Local 2010's speech is attributed to Plaintiffs in the sense that matters for First Amendment purposes, because reasonable people would not believe that all bargaining unit workers necessarily *agree with* the exclusive representative or its positions.

In *Rumsfeld v. FAIR,* 547 U.S. 47 (2006), for example, law schools were required to "'associate' with military recruiters in the sense that they interact[ed] with them." *Id* at 69. Nonetheless, there was no impingement of the law schools' First Amendment rights because the presence of military recruiters on campus would not lead reasonable people to believe the "law schools agree[d] with any speech by recruiters." *Id.* at 65; *see also Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 457-59 (2008) (Roberts, C.J., concurring) (explaining that certain cases involved "forced association" because outsiders would believe that parties "endorsed"

---

[6] Because Plaintiffs is not required to say or do anything by virtue of Local 2010's designation as the exclusive representative of their bargaining unit, their claim does not involve the kind of compelled speech at issue in cases like *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624 (1943).

or "agreed with" another party's message); *Jarvis v. Cuomo,* 2015 WL 1968224, at *6

(N.D.N.Y. Apr. 30, 2015) (explaining that "[t]he public's perception is relevant in

forced association cases").

     The same is true here. Under HEERA, the chosen exclusive representative

serves as the representative of the bargaining unit *collectively* and *as a whole,* rather

than serving as the individual representative or agent of any particular bargaining unit

member. *See, e.g., Reisman,* 2018 WL 6312996, at *5 ("The Union is not ... [a non-

member's] individual agent. Rather, the Union is the agent for the bargaining-unit

which is a distinct entity separate from the individual employees who comprise it.").

Indeed, when negotiating or enforcing a collective bargaining agreement, the exclusive

representative must often weigh the competing interests of different employees in the

bargaining unit and determine what is best for the unit as a whole.

     Because different viewpoints exist within every democratic system and because

exclusive representatives represent the bargaining unit as a whole, public employers in

systems of exclusive representation-based collective bargaining like that established by

the HEERA reasonably understand that not all unit employees necessarily agree with

the union that a majority has designated as the exclusive representative. *See Knight,*

465 U.S. at 276 ("The State Board considers the views expressed ... to be the faculty's

official collective position. It recognizes, however, that not every instructor agrees

with the official faculty view...."). Moreover, just as reasonable people understand that

the views of a parent-teacher association, alumni association, elected congressional

representative, or bar association are not necessarily shared by every parent, alumnus,

constituent, or attorney, reasonable people understand that individuals in the

bargaining unit represented by Local 2010 do not necessarily agree with every position

taken by Local 2010. *See, e.g., Lathrop v. Donohue,* 367 U.S. 820, 859 (1961)

(Harlan, J., concurring) ("[E]veryone understands or should understand that the views

expressed are those of the State Bar as an entity separate and distinct from each

individual.").

1   For these reasons, Local 2010's views are not attributed or imputed to individual

2   bargaining unit employees in a First Amendment sense. *D'Agostino,* 812 F.3d at 244

3   (Souter, J., sitting by designation) ("[W]hen an exclusive bargaining agent is selected

4   by majority choice, it is readily understood that employees in the minority, union or

5   not, will probably disagree with some positions taken by the agent answerable to the

6   majority."); *Jarvis,* 2015 WL 1968224, at *6 ("[The Union's] representation of

7   Plaintiffs would not be likely to create the perception that Plaintiffs endorse [the

8   Union's] expressive activities.... A reasonable person would not perceive that the

9   activities of [the Union], as a majority-elected representative, ... are identical with the

10  views of the providers it represents."). Because such attribution is a necessary element

11  of plaintiff's compelled speech and association claim, Plaintiffs' claims regarding

12  "compelled association" fail for this separate reason as well.

### CONCLUSION

14  For the foregoing reasons, the Court should deny Plaintiffs' motion for a

15  preliminary injunction.

17  Dated:  May 17, 2019                    BEESON, TAYER & BODINE, APC

19                                          By:   ___/s/ Andrew H. Baker___
20                                              ANDREW H. BAKER
                                                Attorneys for Teamsters Local 2010

**CERTIFICATE OF SERVICE**

Case Name     O'Callaghan, Cara, et al. v. Regents     No. 2:19-cv-02289- JVS(DFM)
of the University of California, et al.

I hereby certify that on (date), I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system.

TEAMSTERS LOCAL 2010'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on (date), at Oakland, California.

*/s/ Esther Aviva*
Esther Aviva
Secretary to Andrew H. Baker